UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KATHRYN E. NIXON,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>FRANCISCAN HEALTH SYSTEM, et al.,<br><br>　　　　　　Defendants. | CASE NO. C11-5076BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR RECONSIDERATION |

This matter comes before the Court on Plaintiff Kathryn E. Nixon's ("Nixon") motion for reconsideration. Dkt. 66. The Court has considered the pleadings filed in support of the motion and the remainder of the file and hereby grants in part and denies in part the motion for reconsideration for the reasons stated herein.

**I. MOTION FOR RECONSIDERATION**

On March 12, 2012, the Court issued an order granting Defendant Franciscan Health System's ("Franciscan") motion for summary judgment. Dkt. 64. On March 14, 2012, Nixon filed a motion for reconsideration of the Court's order. Dkt. 66.

Motions for reconsideration are governed by Local Rule CR 7(h), which provides in relevant part as follows:

> Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence.

Local Rule CR 7(h)(1).

Here, in its motion for reconsideration, Nixon points out a clerical error made by the Court in citing to an improper docket number. As Nixon states, on page eleven of the Court's order, the citation to Docket 34, Exhibit 22 following the quotation "even offering her the possibility of working at other locations away from Mian," should have been a citation to Docket 34, Exhibit 24. The Court will issue an amended order that reflects this change.

With the exception of the docket citation discussed above, the Court concludes that Nixon has failed to show manifest error in the Court's order granting summary judgment in favor of Franciscan. However, out of an abundance of caution, the Court provides additional analysis below regarding Franciscan's investigation and actions following the incident reported by Nixon.

## II. PROCEDURAL AND FACTUAL HISTORY

As the Court articulated in its order granting summary judgment, assuming the facts as alleged by Nixon in her complaint, the conditions Nixon experienced at the hospital did not rise to the level of pervasiveness and severity required by the law.

Franciscan maintains that summary judgment should be granted in its favor even if the facts contained in Nixon's complaint are accepted as true. Dkt. 31 at 22, 23. Accordingly, again, as the Court stated in the order granting summary judgment, unless otherwise noted, solely for purposes of deciding Franciscan's motion for summary judgment, the Court will accept as true the facts contained in Nixon's complaint. Nixon alleges the following facts in her amended complaint:

On January 12, 2010, while working at St. Joseph Medical Center, Defendant Atif Mian ("Mian"), who was contracted to Franciscan as a physician (Dkt. 11 at 3), intentionally touched Nixon's buttocks in an offensive and sexual manner, causing Nixon to suffer severe emotional distress and trauma. *Id*. Nixon reported this incident to her immediate supervisor, Cyril Elep ("Elep"). *Id*. at 4.

Elep responded to Nixon's report, in an email, asking Nixon to meet with Elep and Jaime Broadfoot ("Broadfoot") of Human Resources to discuss the incident and how to proceed with Nixon's report. *Id*.

On or about January 21, 2010, Nixon saw Mian at the workplace. *Id*. Though the two did not exchange words or interact, Nixon saw Mian, which caused Nixon additional emotional distress. *Id*. She claimed to have responded so adversely to seeing Mian that she needed time away from work, and her employer agreed to put her on paid administrative leave. *Id*.; Dkt. 34-17. On or about March 9th, 2010, while Nixon was still on leave, Fransciscan informed her that the investigation was complete and that she should come to the hospital for a meeting with Human Resources, during which the results of the investigation would be discussed with her. Dkt. 11 at 5. Nixon "refused to

return to the workplace to receive the results of the investigation, as she feared encountering defendant Mian again." *Id.* On April 15, 2010, Franciscan informed Nixon that the results were inconclusive, and that Franciscan could not conclude that Mian had engaged in the alleged inappropriate action. *Id*. Nixon never returned to work and resigned. *Id*. at 7.

Though not included in her complaint, Nixon has not disputed the following facts: On January 15, 2010, two days after Elep received Nixon's report, Nixon and her supervisor met with Broadfoot to discuss the alleged touching, and address any concerns regarding Nixon's comfort and safety at work, should she have to interact with Mian again. Dkt. 40 at 4; Dkt. 41-4 at 5-6. The three of them discussed "safety planning" to ensure Nixon's comfort at work, at which time Elep and Broadfoot encouraged Nixon to report any additional concerns or uncomfortable interactions with Mian. Dkt. 41-4 at 5, 6. Nixon was also encouraged to "try to keep her distance" from Mian, and "to use security to escort her to her car if she wanted that." Dkt. 40 at 4-5 (citing Dkt. 35-2). Because Mian had staff privileges, he was allowed to visit his patients and neither Elep nor Broadfoot were able to tell him not to visit his patients on the ninth floor where Nixon worked. Dkt. 35-2 at 1. Broadfoot reported Nixon's complaint to the Director of Human Resources, Sharon Royne ("Royne"), on January 18, 2010. Dkt. 40 at 5. That afternoon, Broadfoot and Royne met with the Vice President for Quality and Associate Chief Medical Officer, Dr. Tony Haftel ("Dr. Haftel"), to discuss Nixon's report. *Id*. The three decided to move forward with the investigation by having Broadfoot talk with any identifiable witnesses that would have relevant information about the incident or "other

concerns about Dr. Mian." *Id.* (citing Dkt. 35 at 4-5). It was also decided that Dr. Haftel and Royne would meet with Mian to discuss the incident. *Id.*; Dkt. 35 at 5. Before meeting with Mian on February 16, 2010, Broadfoot interviewed several "background witnesses." Dkt. 40 at 6; Dkt. 35 at 5. Eventually, Franciscan concluded it could not determine that Mian had engaged in inappropriate behavior or that disciplinary action was warranted. Dkt. 31 at 11.

### III. DISCUSSION

An employer is deemed responsible for an employee's sexually harassing conduct when it fails to take corrective action after learning of the harassment, or when it takes inadequate action that emboldens the harasser to continue his abuse. *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001). Once an employer becomes aware of harassing conduct, it has a duty to take remedial measures "reasonably calculated to end the harassment." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 1522, 1528 (9th Cir. 1991). As the *Swenson* court explained, the employer's corrective actions have two parts. *Swenson,* 271 F.3d 1184 at 1992. "The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation." *Id*. In evaluating the first part of the employer's response, the *Swenson* court clarified the importance of the employer's investigation itself, stating that "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id*. at 1193. By simply opening an investigation, "the employer

puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace." *Id*. While the investigation is pending, the employer must take more significant steps to prevent further contact between the complainant and alleged harasser when the behavior is more egregious and when there is more substantial proof supporting the allegations. *Id*. at 1192-1193. The Ninth Circuit also looked at whether or not the employees must be separated, and explained that the "degree of separation imposed, if any, must be a function of the severity of the alleged harassment and the evidence provided to the employer in support of the complaint." *Id*. While the investigation is pending, the employer must take more significant steps to prevent further contact between the complainant and alleged harasser when the behavior is more egregious or when there is more substantial proof supporting the allegations. *Id*. at 1192-1193.

In *Swenson,* the plaintiff alleged that a coworker, Feiner, had engaged in inappropriate behavior which included making sexual remarks and propositions, and culminated in an incident during which Feiner grabbed Swenson's hand and attempted to kiss it. *Id*. at 1190. Once notified of the behavior, the employer, the Postal Service, immediately initiated an investigation which involved speaking with the harasser, explaining the gravity of the complaint, and warning him to leave Swenson alone. *Id*. at 1192. Swenson was moved to another area pending the completion of the investigation. *Id*. Notably, "[s]eperating Swenson and Feiner did not eliminate all contact between them, but the Postal Service was not required to provide Swenson with a Feiner-free workplace merely because she complained about him." *Id*. The investigation concluded

after several months when the employer found that it could not discipline Feiner for sexual harassment. *Id.* at 1194. Scheduling difficulties delayed the investigation, but the court found that "[a]ll things considered, the Postal Service's interim response to Swenson's complaint was prompt and entirely appropriate." *Id.*

Here, like the employer in Swenson, Franciscan started an investigation the same day it learned of the Nixon's complaint. Dkt. 11 at 3. Both employers interviewed the complainant, potential witnesses, and the alleged harasser, and took the time to explain the gravity of the situation to the alleged abuser. *Id.*; Dkt. 40 at 6. The Swenson court noted that the employer, during its interviews of the plaintiff, made serious attempts "both to determine what had happened and to try to find a way to make her comfortable in the workplace." *Swenson,* 271 F.3d 1184 at 1194. Similarly, during its interview with Nixon, Franciscan granted Nixon paid administrative leave (Dkt. 34-17), offered her use of security escorts if she wanted such service (Dkt. 41-4 (*citing* Dkt. 35-2)), and encouraged her to take additional steps if she felt it necessary for her safety, such as keeping her distance from Mian. *Id*. Despite what Nixon argues in her motion, just because Nixon was offered additional services in an attempt to make her feel more comfortable at work does not mean that Nixon "was warned by the employer that she should be on guard against her harasser." Dkt. 66 at 2. Significantly, Swenson and her alleged harasser, Feiner, were not completely separated, and did encounter one another after Swenson reported the harassment to her employer, yet the court found that the employer was not required to "provide Swenson with a Feiner-free workplace merely because she complained about him." *Swenson,* 271 F.3d 1184 at 1992. Because of the

conduct of which Nixon complains, a "groping," and the lack of proof to support her complaint (no witness actually saw the incident), based on the evidence in the record, Franciscan had no obligation to summarily prohibit Mian from seeing his patients. By promptly initiating an investigation, advising Mian not to retaliate or engage in harassing behavior, offering Nixon additional services to ensure her safety, and encouraging her to take additional steps to ensure her own safety, Franciscan met its obligations under the first part of the analysis, despite the fact that it did not exclude Mian from the ninth floor where Nixon worked. Dkt. 35 at 3.

The Court could end its analysis at this point, concluding that Franciscan's conduct during the investigation amounted to adequate remedial action, because there was not enough evidence to substantiate Nixon's complaint. The Court will, however, also examine Franciscan's conduct after the investigation concluded. In *Swenson*, the contact between Swenson and Feiner was much more frequent, amounting to sixteen different encounters over a fourteen-month period, but the encounters were similar in nature to that of Nixon and Mian. "While Swenson expressed discomfort with working in the same 435,000 square foot facility as Feiner, she saw him only about once a month and then usually from a distance" and "their contacts involved no speech or physical contact." *Id*. at 1195. The court also explained that "even if we allow for the fact that Swenson may have been particularly sensitive to contact with Feiner following his misconduct, none of their encounters, either alone or collectively, amount to sexual harassment." *Id.* The court found that the harassment had actually stopped during the investigation, when Swenson was moved to another area, despite the fact that she encountered Feiner an additional

sixteen times. Following her report, Nixon, by her own admission, merely saw Mian once down a hallway. Dkt. 11 at 4. Although Nixon was not moved to another floor of the hospital, and saw Mian on that floor, because this encounter with Mian could not possibly amount to a hostile work environment that altered the conditions of her employment, Franciscan cannot be held liable as violating Title VII. Franciscan conducted an adequate investigation that involved interviewing Nixon, Mian, Mian's former employers, and several of Nixon's coworkers, but could not conclude that Mian had engaged in inappropriate conduct warranting discipline. Dkt. 31 at 11. "As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment." *Swenson,* 271 F.3d 1184 at 1196. Franciscan offered Nixon the possibility of working at another location, but she refused. The Court cannot require Franciscan to violate its contractual agreement with Mian simply because Nixon made an allegation of harassment that could not be substantiated.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Nixon's motion for reconsideration (Dkt. 66) is **GRANTED in part** and **DENIED in part** as discussed herein.

Dated this 29th day of March, 2012.

BENJAMIN H. SETTLE
United States District Judge